UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal Number:** |
| | : | |
| v. | : | **Violations:** |
| | : | |
| **IJOMAH OPUTA, a.k.a.** | : | **18 U.S.C. § 1343 (Wire Fraud);** |
| **Gerald Green,** | : | **18 U.S.C. § 2 (Aiding and Abetting,** |
| | : | **Causing an Act to be Done)** |
| Defendant. | : | **18 U.S.C. § 981(a)(1)(C), 21 U.S.C. §** |
| | : | **853(p), 28 U.S.C. § 2461(c) (Criminal** |
| | : | **Forfeiture)** |

## INFORMATION

The United States Attorney charges that, at all times material to this Information:

### Introduction

1. Defendant IJOMAH OPUTA was a resident of Los Angeles, California, and operated under the pseudonym "Gerald Green."

2. Defendant IJOMAH OPUTA did business under the name "Elliot Global Partners," a purported biofuel importation company, and used the domain "elliotpartners.com."

3. Fuel Company A was a renewable fuel producer based in Singapore.

4. Individual JMS was the General Manger of Fuel Company A.

5. Fuel Company B was a renewable fuel producer in Hamburg, Germany.

6. RIN Trading Company 1 was a biofuel trading company based in New York.

7. RIN Trading Company 2 was a third-party broker of RIN transactions based in Iowa.

8. RIN Certification Company was a company in the business of certifying the authenticity of RINS and based in Texas.

**Applicable Law**

9. The Energy Policy Act of 2005 established the nation's first renewable fuel standard (RFS1), which mandated that gasoline and diesel fuel producers and importers ("obligated parties") introduce a minimum of 4.0 billion gallons of renewable fuel into the national fuel mix in 2006, and which increased the mandate to 7.5 billion gallons by 2012. Two years later, the Energy Independence and Security Act of 2007 established a new expanded renewable fuels mandate (RFS2). RFS2 required the annual use of 9.0 billion gallons of renewable fuels in 2008, rising to 36 billion gallons annually in 2022. RFS2 applies to all transportation fuel used in the United States.

10. Under RFS2, renewable fuels are fuels produced from renewable biomass, (definition of "renewable fuel" at Title 40 of the Code of Federal Regulations (C.F.R.), Section 80.1401), that also meet other regulatory requirements, including those set out at Table 1 of 40 C.F.R. § 80.1426. Such renewable fuels include, among other things, corn-based ethanol, biodiesel, and renewable diesel.

11. The United States Environmental Protection Agency (EPA) is responsible for implementing regulations to ensure that the fuel supply sold in the United States during a given year contains the mandated volume of renewable fuels. Under RFS2, obligated parties have a Renewable Volume Obligation (RVO), which represents an amount of renewable fuel that they are required to introduce into the non-renewable (fossil) fuel supply each year. The RVO for an obligated party is based on its annual production and/or imports of gasoline and diesel fuel. Each year, obligated parties must calculate their RVOs, which they fulfill by producing (or importing)

qualifying biofuels or by obtaining tradable credits based on qualifying biofuels that others produce (or import), as discussed below. Obligated parties must demonstrate their compliance with their RVO or they may incur civil penalties.

12. The EPA established a system of tradable credits for renewable fuels, known as Renewable Identification Numbers (RINs) to facilitate compliance with the RFS1 and RFS2. Each RIN is a unique identifier generated to represent a volume of renewable fuel pursuant to Sections 80.1425 and 80.1426. *See* 40 CFR § 80.1401. Under this system, obligated parties must annually retire a designated number of RINs. Obligated parties obtain those RINs: (1) by producing renewable fuel themselves (which generates RINs); (2) by importing renewable fuel produced by approved foreign producers (which generates RINs); (3) by purchasing renewable fuel (with associated RINs) from approved domestic producers; or (4) by purchasing RINs without the underlying renewable fuel.

13. The RIN is the basic currency for the RFS program, used by gasoline and diesel fuel producers and importers to demonstrate that they have met their RVOs. They are generated by the producer or importer of renewable fuel and then are used to track volumes of renewable fuels and compliance with the RVO.

14. RINs can remain "assigned" to renewable fuel when ownership of that fuel changes, but can also be "separated" from the renewable fuel under certain circumstances. For instance, once the renewable fuel is legally blended into fossil-based motor vehicle fuel, the RIN need no longer be transferred with the fuel that led to its generation. Instead, the "separated" RIN can be traded, held for future compliance, or retired to satisfy an obligated party's RVO.

15. A market has developed for RINs, which allows obligated parties to fulfill their RVOs by purchasing RINs, sometimes for as much as $1.80 per RIN. These transactions usually involve thousands of RINs in a single batch. Thousands of RIN transactions are electronically recorded with EPA every week. Hundreds of millions of dollars' worth of RINs are exchanged every year.

16. RINs can only be transferred to parties registered for the RFS program. Therefore, producers and importers of renewable fuel can only realize the value of a RIN by selling to other registered parties.

17. EPA RFS2 regulations require that all RINs generated after July 1, 2010, be transferred only through the EPA Moderated Transaction System (EMTS), an internet-accessible transaction platform used by regulated parties to generate, separate, sell, and retire RINs. *See* 40 CFR § 80.1452. All EMTS activity is conducted through a Central Data Exchange account where users must create an individual user identity. In order to submit data electronically through the EMTS, the data exchange requires the use of a computer and internet access. For example, a renewable fuel producer could log on, electronically register a volume of renewable fuel produced, and declare the number of RINs that are generated for and assigned to that volume. After a buyer and seller reach an agreement to trade RINs, the seller posts the sale of the RINs on the EMTS at a certain price. The buyer logs into EMTS, verifies that the information matches the deal the buyer made with the seller, and then accepts the transaction. Upon acceptance, the RINs are transferred from the seller's RIN account to the buyer's. EPA does not guarantee the validity of RINs, nor is money for RINs transferred through any EPA system. Nevertheless, under RFS2,

no RIN transfer occurs without the transaction being recorded in EPA's internet-based transaction platform.

18. Any RIN-generating producer or importer of renewable fuel must provide EPA with certain registration information prior to the generation of any RINs for their fuel, including but not limited to:

   a. A description of the types of renewable fuels or ethanol that the producer intends to produce or import; and

   b. Individual names, business names, titles, contact email addresses, phone numbers, and physical address information associated with the producer or importer.

19. The definition of a RIN specifies that it is "a unique number generated to represent a volume of renewable fuel." 40 CFR § 80.1401. Since each RIN is unique to a volume of renewable fuel, it is illegal to generate RINs on volumes of fuel for which RINs have already been generated or on volumes of fuel that were never produced. *See* 40 CFR § 80.1460(b)(1) and (b)(6).

## **COUNT ONE**

### **(Wire Fraud)**

20. Paragraphs 1 through 19 of this Indictment are re-alleged and incorporated as if fully set forth herein.

21. From in or about July 2017, through in or about May 2021, in the District of Columbia and elsewhere, the defendant,

IJOMAH OPUTA,

5

knowingly devised and intended to devise a scheme and artifice to defraud and to obtain monies by means of materially false and fraudulent pretenses, representations, and promises.

### The Fraud Scheme

22. On or about July 2017, the defendant, acting as Elliot Global Partners, submitted registration information for Elliot Global Partners to the EPA in Washington, D.C., representing that Gerald Green was the Chief Operating Officer of Elliot Global Partners.

23. In September 2017, the defendant mailed records containing the forged signature of JMS, Fuel Company A's General Manager, to EPA offices in Washington, D.C., claiming that Gerald Green of Elliot Global Partners was an authorized agent of Fuel Company A.

24. On September 1, 5, 7, and 15, 2017, the defendant falsely recorded the generation of four batches of RINs in EMTS, totaling approximately 1.3 million RINs valued at approximately $1.3 million, associated with fuel purportedly manufactured by Fuel Company A in Singapore.

25. On March 30, 2020, the defendant falsely recorded the generation of approximately 976,000 fraudulent RINs in EMTS, with an approximate value of $449,000, on fuel falsely claimed to have been imported from Fuel Company B in Hamburg, Germany.

26. On May 28, 2020, the defendant left a voicemail on an EPA telephone, identifying himself as Gerald Green and requesting technical assistance with EMTS.

27. On January 2, 2021, the defendant generated and recorded approximately 4.8 million fraudulent RINs in EMTS, with an approximate value of $4.8 million, on fuel falsely claimed to have been imported from Fuel Company A.

28.     In a series of transactions documented in EMTS between November 2020 and February 2021, the defendant sold 470,000 fraudulent RINs to RIN Trading Company 1, through RIN Trading Company 2, for a total of $426,200. In the course of these transactions, the defendant generated and sent to RIN Trading Company 1 forged and fraudulent records purporting to document the importation of biofuel that had never actually been manufactured or imported.

29.     On November 3, 2020, the defendant provided RIN Trading Company 1 with wiring information to facilitate the sale of RINs. The wiring instructions were for an account that the defendant had fraudulently created in May 2020, using another person's name without their knowledge. RIN Trading Company 1 wired the funds for the purchase of the fraudulent RINs to this bank account.

30.     On March 23, 2021, the defendant received an EPA Notice of Violation (NOV), addressed to Elliot Global Partners and Gerald Green at 5850 W 3rd Street, Unit 368, Los Angeles, CA, regarding the generation of invalid RINs. The defendant also received the EPA NOV at the email address admin@elliotpartners.com. The defendant replied to EPA from the admin@elliotpartners.com email address, claiming "the violations determined are in error. I shall respond with details shortly." The email was signed "G. Green."

31.     On May 5, 2021, the defendant, using the name John Batista and claiming to represent Elliot Global Partners, left a voicemail with RIN Certification Company requesting assistance "certifying" RINs, for the purpose of facilitating the sale of RINs whose validity others might question.

### The Execution of the Scheme

32. On or about May 28, 2020, in the District of Columbia and elsewhere, for the purpose of executing and attempting to execute the fraud scheme described above, the defendant,

IJOMAH OPUTA,

transmitted and caused to be transmitted in interstate commerce, by means of wire communication, writings, signs, signals, pictures, and sounds, namely: a telephone message to EPA requesting technical assistance.

**(Wire Fraud and Aiding and Abetting, Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1343 and 2.)**

### FORFEITURE ALLEGATION

33. Upon conviction of either of the offenses listed in Count 1 and/or Count 2 of this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

34. The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

35. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be divided without

difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United Sates Code, Section 2461(c), and Title 21, United States Code, Section 853(p)).**

Matthew Graves
United States Attorney

By: */s/ Jennifer Leigh Blackwell*

Jennifer Leigh Blackwell
Assistant United States Attorney

Todd Kim
Assistant Attorney General

By: */s/ Cassandra Barnum*

Cassandra Barnum
Senior Trial Attorney

DATED: January 6, 2023