## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No.** |
| | : | |
| **v.** | : | **1:23-cr-00010-TNM** |
| | : | |
| **IJOMAH OPUTA,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorneys, the United States Attorney for the District of Columbia and the Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice, respectfully submits this memorandum in aid of sentencing. On May 19, 2023, defendant Ijomah Oputa ("defendant") will plead guilty to one count of wire fraud and aiding and abetting in connection with the fraudulent sale of Renewable Identification Numbers (RINs), and will be sentenced at the same time by agreement of the parties and the Court. The government requests that this Court sentence the defendant to a term of incarceration of between 37 to 46 months, which is the applicable range under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), and restitution and forfeiture in the amount of $426,000, per the terms of the plea agreement. The defendant committed the instant fraud while he was engaged in multiple other fraud schemes. He stole an identity to open a bank account and faked involvement in military affairs in support of his fraud. And he took advantage of a government program intended to promote green energy to line his own pockets. A sentence of incarceration is warranted.

## I.      Introduction

The defendant committed fraud in the market for RINs, a commodity established in the context of Congress' efforts to promote clean energy via renewable fuel standards, as explained below.

### A.  Statutory/Regulatory Background

The Energy Policy Act of 2005 established the nation's first renewable fuel standard (RFS1), which mandated that gasoline and diesel fuel producers and importers (called "obligated parties") introduce at least 4 billion gallons of renewable fuel into the national fuel mix in 2006. Renewable fuels are fuels produced from renewable biomass, including corn-based ethanol, biodiesel, and renewable diesel. That mandate increased to 36 billion gallons annually in 2022. The current renewable fuels standard, RFS2, applies to all transportation fuel used domestically.

The United States Environmental Protection Agency (EPA) published regulations to ensure that the fuel supply sold in the United States during a given year meets the required volume of renewable fuels. Under RFS2, obligated parties have a Renewable Volume Obligation (RVO) which represents an amount of renewable fuel that they are required to introduce into the non-renewable (fossil) fuel supply each year. The RVO for an obligated party is based on its annual production and/or imports of gasoline and diesel fuel. Each year, obligated parties must calculate their RVOs, which they fulfill by producing (or importing) qualifying biofuels or by obtaining tradeable credits based on qualifying biofuels that others produce (or import), as discussed below. Obligated parties must demonstrate their compliance with their RVO or they may incur civil penalties.

1.  Renewable Identification Numbers (RINs)

The EPA established a system of tradeable credits for renewable fuels, known as Renewable Identification Numbers (RINs), to facilitate compliance with RFS2. A RIN is a unique identifier representing a volume of renewable fuel. The RIN is the basic currency for the RFS program, used by gasoline and diesel fuel producers and importers to demonstrate that they have met their RVOs. They are generated by the producer or importer of renewable fuel and then are used to track volumes of renewable fuels and demonstrate compliance.

Obligated parties must annually "retire" a designated number of RINs. Obligated parties obtain those RINs: (1) by producing renewable fuel themselves (which generates RINs); (2) by importing renewable fuel produced by approved foreign producers (which generates RINs); (3) by purchasing renewable fuel (with associated RINs) from approved domestic producers; or (4) by purchasing RINs without underlying renewable fuel.

RINs can remain "assigned" to renewable fuel when ownership of that fuel changes, but can also be "separated" from the renewable fuel under circumstances defined in EPA's regulations. One way to separate RINs is to legally blend it into fossil-based motor vehicle fuel. Once that is done, the separated RINs can be traded, held for future compliance, or retired to satisfy an obligated party's RVO.

As Congress intended, a market developed for RINs, allowing obligated parties to fulfill their RVOs by purchasing RINs, sometimes for as much as $1.80 per RIN. These transactions usually involve thousands of RINs in a single batch and thousands of RIN transactions are electronically recorded with EPA every week. Hundreds of millions of dollars' worth of RINs are exchanged every year.

RINs can be transferred only to parties registered for the RFS program. Therefore, producers and importers of renewable fuel can only realize the value of a RIN by selling to other registered parties.

### 2. EPA Moderated Transaction System (EMTS)

EPA's RFS2 regulations require that all RINs generated after July 1, 2010, be transferred only through the EPA Moderated Transaction System (EMTS), an internet-accessible transaction platform used by regulated parties to generate, separate, sell, and retire RINs. *See* 40 CFR § 80.1452. All EMTS activity is conducted through a Central Data Exchange (CDX) account where users must create an individual user identity. In order to submit data electronically through the EMTS, the data exchange requires the use of a computer and internet access. For example, a renewable fuel producer could log on, electronically register a volume of renewable fuel produced, and declare the number of RINs that are generated for and assigned to that volume. After a buyer and seller agree to a RIN trade, the seller posts the sale of the RINs on the EMTS at a certain price. The buyer logs into EMTS, verifies that the information matches the deal the buyer made with the seller, and then accepts the transaction. Upon acceptance, the RINs are transferred from the seller's RIN account to the buyer's. EPA does not guarantee the validity of RINs, nor is money for RINs transferred through any EPA system. That said, under RFS2, no RIN transfer occurs without the transaction being recorded in EPA's internet-based transaction platform.

## II.    Factual Background

The government relies on the facts set forth in the agreed-upon Statement of Offense, which will be filed with the Court at the time of the plea hearing, and which has been adopted in the Presentence Investigation Report ("PSR"). *See* PSR ¶¶ 9-32.

Defendant ran "Elliot Global Partners" (EGP), which was nominally a renewable fuel

importing company. The business's website, elliotpartners.com, was linked to a tax services company until March 2016, at which point it was altered to appear as a fuel importing company. The website displayed images and text copied from the sites of fuel companies like Royal Dutch Shell, Neste, and Covestro. The images (including oil tankers, trucks, and drilling platforms) and the text taken from the other websites were altered to feature the EGP name and logo.

On July 18, 2017, the defendant, using the name Gerald Green and title Chief Operating Officer, registered EGP with the EPA as a renewable fuel importer. This registration allowed Green/EGP to use the EMTS system to generate RINs. On September 5, 2017, via FedEx, the EPA office in Washington, D.C., received documents stating that Gerald Green of EGP was an agent of a company referred to in the Statement of Offense as Fuel Company A. Fuel Company A was a foreign renewable fuel producer based in Singapore. The authorization paperwork sent to EPA bore the purported signature of Fuel Company A's General Manager. The General Manager confirmed the signature was a forgery in a letter to the EPA dated September 26, 2017.

### A. Fraudulent RIN Generation

On September 1, 5, 7, and 15, 2017, EGP used EMTS to record the fraudulent generation of four batches of RINs. Totaling about 1.2 million RINs, these batches were purportedly associated with fuel manufactured by Fuel Company A. When Fuel Company A learned of the claimed RIN generation, it wrote the EPA, in a letter dated October 10, 2017, to disavow the transactions and confirm that Fuel Company A did not sell fuel to EGP. The fraudulent RINs generated during these four initial transactions were never sold by EGP.

On March 30, 2020, EGP generated just under a million fraudulent RINs on fuel it claimed to have imported from another international fuel producer, referred to in the Statement of Offense as Fuel Company B. Fuel Company B later learned of the transaction and disavowed it in a letter

to EPA dated March 5, 2021. In the letter, Fuel Company B explained that they do not do any business with EGP and do not export fuel to the United States.

Finally, on January 2, 2021, EGP generated another 4.8 million RINs, again claiming to have imported fuel from Fuel Company A. Fuel Company A disavowed the transaction in a letter to EPA dated March 8, 2021.

### B.  Sale of Fraudulent RINs

In five EMTS transactions executed between November 2020 and February 2021, EGP sold 470,000 fraudulent RINs. These were RINS purportedly generated by Fuel Companies A and B that were sold to a New York company referred to in the Statement of Offense as RIN Trading Company 1. The total price was $426,200. The trades were facilitated by a company referred to as RIN Trading Company 2. In the course of negotiating the sale, the defendant provided RIN Trading Company 1 with materials purporting to document the import of fuel upon which the RINs were generated. These documents were forged, and are reproduced as Exhibit 1. They included a bill of lading, a quote for a potential biofuel shipment, and a letter from "Peter Elliot" (another pseudonym) to the Special Inspector General for Afghanistan Reconstruction purporting to thank the addressee for "trusting us with your logistics and alternative fuel tactical assessment initiative."[1]

EGP provided RIN Trading Company 1 with wiring information for an account at TD Bank to facilitate the wire transfer of funds from the sale of the RINs. The account signatory was identified to RIN Trading Company 1 as Gerald Green; the bank account holder, however, was identified as "[WJ] CPA / Elliot Global Partners." TD Bank records show that the account was opened in May 2020 as a personal checking account for "WJ" in Monaca, Pennsylvania. On May

---

[1] *See* Exhibit 1, at EG_00000261. The office of the Special Inspector General for Afghanistan Reconstruction confirmed that no such agreement existed and that the office had no record of any contact with EGP.

26, 2021, "WJ" stated in an interview that he moved away from Monaca in 2005, that he has no bank accounts with TD Bank, and that he is not familiar with Elliot Global Partners, RIN Trading Company 1, or Gerald Green. His identity was stolen and used to open accounts at TD Bank that were used to facilitate the fraudulent transactions. Payments from RIN Trading Company 1 to EGP for the RINs were comingled in the "WJ" TD Bank account with other funds from other suspicious sources. Between when the TD Bank account was fraudulently opened on May 29, 2020, through June 22, 2021, $997,000 went into the account and around $956,600 was transferred out. Of the funds leaving the account, a substantial sum went on through several other accounts, ultimately to be paid out in pre-paid cards from U.S. Bank.

### C.  EPA Notice of Violation and Identification of Defendant

On March 23, 2021, EPA sent a Notice of Violation (NOV) to EGP and Gerald Green at the address 5850 W 3rd Street, Unit ***, Los Angeles, CA, notifying them that they had generated invalid RINs. EPA also sent a copy of the NOV to admin@elliotpartners.com, and received a reply from someone purporting to be "G. Green," claiming "the violations determined are in error. I shall respond with details shortly." EPA never received further communications from Green.

On May 6, 2021, Special Agents from the U.S. Postal Inspection Service and Internal Revenue Service Criminal Investigation, working on a separate fraud investigation,[2] executed a search warrant at the defendant's residence, found the EPA NOV addressed to Gerald Green at the house, and contacted EPA. They also found a notebook with diagrams of the RIN transactions. At least one diagram appears to depict the flow of funds originating from RINs sales and moving through the "WJ" TD Bank account.

---

[2] This investigation resulted in a guilty plea to bank fraud and aggravated identity theft in the District of Oregon, for which the defendant is now serving a sentence in California. *United States v. Oputa*, 3:21-cr-00082. The facts of that case are recited in the PSR at Paragraph 51.



Diagram found in Defendant's home

### III.    Statutory Penalties

The defendant now faces sentencing on one count of wire fraud in violation of 18 U.S.C. § 1343. As noted in the plea agreement and the PSR, this charge carries a maximum sentence of 20 years of imprisonment; a fine of $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b)(3) and (d); a term of supervised release of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

### A.  Analysis of the Recommended Sentencing Range Under the Guidelines

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id*. at 49. The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id*.

According to the PSR, the U.S. Probation Office calculated the defendant's adjusted offense level under the Guidelines as follows:

| Guidelines Section | Calculation |
|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Loss Amount +$250,000 (U.S.S.G. § 2B1.1(b)(1)(G)) | 12 |
| Sophisticated Means (U.S.S.G. § 2B1.1(b)(10)(C)) | 2 |
| Means of Identification (U.S.S.G. § 2B1.1(b)(11)(C)(i)) | 2 |
| Adjusted Offense Level | **23** |

*See* PSR ¶¶ 37-49. The plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation. The Government expects that Mr. Oputa will plead guilty as planned at the hearing on May 19, and that his offense level will be reduced by 3 points under U.S.S.G. § 3E1.1(a) (Acceptance of Responsibility), resulting in a final offense level of 20. The Government agrees with the PSR that the defendant falls into Criminal History Category II. *See* PSR ¶ 52. Therefore, the defendant's final advisory Guidelines Range is 37-46 months.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

The Government's recommended sentence is within the Guidelines Range and is appropriate under the factors the Court must consider pursuant to 18 U.S.C. § 3553(a).

### A.  Nature and Circumstances of the Offense and History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

The defendant engaged in a sophisticated fraud that abused a government program intended to incentivize green energy. He not only invented a fake company from whole cloth, but also forged documents purporting to show that company's involvement in United States military operations.

And he used someone else's identity to open a bank account through which to launder the proceeds of his fraud. Defendant fraudulently generated hundreds of thousands of RINs that he could not convert. The flagrant and sophisticated nature of the fraud warrant a sentence of incarceration.

The defendant is 54 years old and holds both college and graduate degrees. He has previously held positions of employment and earned income. Nonetheless, he chose to pursue fraud as his career, resulting in his becoming the target of two simultaneous federal criminal fraud investigations. He has also not had a perfect disciplinary record while incarcerated, having been cited twice for Being in an Unauthorized Area.

**B. Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment (18 U.S.C. § 3553(a)(2)(A))**

Abuse of the RIN system is a serious problem, and a Guidelines sentence here will promote respect for EPA's rules. As set forth above, EMTS is a system for RIN trades, not for policing financial transactions. Scofflaws like defendant appear to assume that because RIN trades are not occurring in a regular commodities market, they are not policed. Prosecutions like this one establish that substantial illegal transactions in the renewable fuels space will be treated as serious crimes. Further, just punishment is necessary to balance defendant's crimes against the efforts of others to genuinely engage with the RFS and its requirements. Allowing criminal conduct like this to go unpunished would be unjust to those who follow the rules.

**C. Provide Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))**

A sentence within the Guidelines will be an adequate deterrent to the defendant. The defendant has been engaged in fraud for a long time. As discussed above, his initial forays involved production of fake RINs that he never tried to sell, as far back as 2016. Later, he dipped into the well again and, eventually, sold hundreds of thousands of RINs for hundreds of thousands of dollars. His efforts were not one-off experiments to see what was possible. He schemed to get his

money and hide it from investigators, using a stolen identity. As such, a significant sentence is necessary to deter such conduct generally and with respect to defendant, specifically.

**D.  Protect the Public (18 U.S.C. § 3553(a)(2)(C))**

Other than an appropriate period of supervised release, the Government does not see a need to protect the public from the defendant through an incapacitating sentence above the Guidelines range. The specific deterrent effect of a Guidelines sentence and the supervisory period following a term of imprisonment should ensure that the defendant makes his living in ways that do not expose him to future punishment.

**V.      Restitution and Forfeiture**

The parties agreed, as permitted under 18 U.S.C. §§ 3663A and 3663(a)(3), that the defendant pay restitution in the amount of $426,000 to the victim of his wire fraud. Based on information obtained to date, the government believes that RIN Trading Company 2 bore the cost of the fraudulent RIN transactions, and that the defendant should be ordered to pay restitution to RIN Trading Company 2 in the amount of $426,000. *Plea Agreement ¶ 10.* The government has been in communication with RIN Trading Company 2 and anticipates receiving a Victim Impact Statement from that company prior to the hearing. The government will file additional materials on this subject as they become available.

The defendant also agreed to a consent order of forfeiture in the same amount, per the terms of the plea agreement. *Plea Agreement ¶ 11.*

**VI.     Conclusion**

The government recommends a sentence of imprisonment between 37 and 46 months, as contemplated by the Guidelines, followed by an appropriate period of supervised release as determined by the Court. The government also requests that the Court enter the consent order of

forfeiture, and that the Court order restitution to the victim of the offense in the amount of $426,000, per the terms of the plea agreement. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty because of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   *s/Jennifer Leigh Blackwell*
Jennifer Leigh Blackwell
Assistant United States Attorney
D.C. Bar No. 481097

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment and Natural Resources Division
United States Department of Justice


By:   /s/
CASSANDRA BARNUM
Senior Trial Attorney
Environmental Crimes Section
Cassandra.Barnum@usdoj.gov
150 M. St. NE
Washington, DC  20004
(202) 305-0333


DATED: May 12, 2023